## MEXICAN PETROLEUM CORPORATION OF LOUISIANA, Inc., v. NORTH GERMAN LLOYD.

(District Court, E. D. Louisiana. December 16, 1926.)

No. 18552.

**1. Contracts ☞1—To constitute "contract," there must be measurable and absolute undertaking.**

In order to constitute a contract, there must be a measurable and absolute undertaking to do or not to do some express and definite thing.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract.]

**2. Contracts ☞10(3)—Contract for shipment of available material on ships agreeing to load it held not lacking in mutuality and enforceable.**

Contract by established business concern for shipment of available material to each steamer, agreeing to load material, *held* not lacking in mutuality, and enforceable against either party, since it is not dependent on mere expectation nor on potestative condition.

**3. Admiralty ☞73—Admiralty court, in determining controversy over ambiguous maritime contract, is not limited to evidence admissible in law court.**

An admiralty court, in determining a controversy over ambiguous maritime contract, is not limited to evidence ordinarily admissible in court of law.

In Admiralty. Libel by the Mexican Petroleum Corporation of Louisiana, Inc., against the North German Lloyd. On exceptions of no cause of action filed by respondent. Exceptions overruled.

Milling, Godchaux, Saal & Milling, of New Orleans, La., for libelant.

Carroll & Carroll and R. B. Montgomery, all of New Orleans, La., for respondent.

BURNS, District Judge. An exception of no cause of action was filed by respondent to the libel herein, upon the ground that the contract of affreightment, sued upon for damages for a breach, is a nudum pactum for want of consideration or mutuality appearing upon the face of the instrument.

The pertinent parts of the contract are:

"New Orleans, June 29, 1926.

"Mexican Petroleum Corp. of La., Inc., Shipper.

"Farrell Shipping Company, Inc., Broker.

"We confirm engagement to-day of (see reverse side) per S. S. of the North German Lloyd and/or Roland Line, A. G. for Hamburg, Germany, at $4.50 per ton of 2,240 lbs. Freight prepaid. Steamer assuming Hamburg quay dues.

"Delivery as required by steamer. Steamer to give shippers 15 days' notice of expected date ready to load Destrehan, at which time shippers are to declare quantity. Barrels and/or drums to be stowed so much as possible in steamers between decks and not over 4 tiers in height."

The reverse side referred to reads as follows:

"Shipper agrees to deliver all asphalt available for a period of ninety (90) days, beginning when the S. S. Raimund is ready to load at Destrehan, to each steamer who agrees to load same, but shall not be obligated to load more than 1,250 tons per steamer nor to shift to Destrehan for less than 1,000 tons. However, the S. S. Raimund will not be obligated to load more than 1,000 tons."

[1] It is conceded that, in order to constitute a contract, there must be a measurable and absolute undertaking to do or not to do some express and definite thing.

Respondent contends that this contract furnishes a twofold example of want of mutuality arising out of:

(a) The first phrase in the stipulation on the reverse of the contract, "Shipper agrees to deliver all asphalt available for a period of 90 days. * * *"

(b) The third phrase of the same sentence, "* * * to each steamer who *agrees* to load same. * * *"

It is argued that the use of the word "available," upon a fair construction of phrase (a), leaves the shipper with power to ship asphalt at its option; that, in a hypothetical suit for specific performance under the contract, with the libelant as respondent, a successful defense could be presented upon these grounds:

(1) It is true we produced large amounts of asphalt during the period, but we shipped it to better advantage on other ships; therefore none was available.

(2) We produced during the time, but sold it at home; hence there was none available.

(3) We produced during the time, but

preferred to store until a better market; hence none was available.

As to the phrase (b), the argument is that the use of the present tense "agrees" in no wise affects the construction; that the present is often used for the future, so often that it is sometimes classed as one form of the future tense; that the use of the formal future frequently sounds stilted.

Proceeding, the argument is that the carrier was not bound to accept asphalt tendered by the shipper because the ship to which it was offered might not agree to load same; that therefore the instrument merely evidenced a state of mind, a present willingness to do thus and so, without obligation to do it; that the contract was in the nature of a gentlemen's agreement, to the effect that, if libelant had some cargo it wanted to ship and the respondent had a ship it was willing to carry it in, then they might will to do so, but legally neither was bound.

On the other hand, libelant contends that the whole of the contract must be considered together; that its words and phrases must be considered together with the context, and the whole together with the allegations of the libel and the supplemental libel, which sets out in detail all of the correspondence preceding and succeeding the execution of the formal document, particularly since this cause is before a court of admiralty, which administers justice upon the highest and most liberal principles; that the word "available," as used, meant all of the asphalt produced by it to be shipped to Hamburg during the period; that the contract specifically recites, "this contract is for freight room required by the shipper herein," and is conditional only on the continuance of itself and the steamship company in business, the one producing and selling asphalt and the other sailing its steamers; that it covered all asphalt of libelant, required and suitable or capable of being used, or sold for shipment to Hamburg; that the whole clause, "shipper agrees to deliver all asphalt available for a period, etc., to each steamer who agrees to load same, but shall not be obligated to load more than 1,250 tons," etc., clearly obligated both itself and the steamship company to perform, during the period of contract and their continuance in business; that the phrase, "who agrees to load same but shall not be obligated," etc., evidenced a present agreement of the steamship company for each of its available steamers to load the cargo delivered at shipside; that the negotiations between the parties, as shown by the letters of negotiation quoted in the supplemental libel, and which the respond-

ent did not move to strike out as irrelevant, impertinent, or foreign to the matter in controversy, must be considered together with the formal contract in determining whether a cause of action is shown; and that these allegations and letters show specifically that in soliciting the carriage of its product the respondent knew the approximate tonnage shipped by libelant to Hamburg for several years preceding, just as it knew the respondent's schedules of sailing for that port.

[2] My conclusion is that the contract is enforceable on both sides; that the shipper was bound to deliver at shipside of each steamer belonging to the carrier all available asphalt destined for Hamburg during the period of 90 days following the sailing of its steamship Raimund—such steamers being bound to take such shipments not in excess of 1,250 tons nor less than 1,000 tons.

By shipping the contemplated cargo on the steamers of any other carrier, the shipper would have certainly been liable in damage for the breach, and correspondingly, by refusing available cargo, the carrier is liable.

[3] An admiralty court, having to determine a controversy over a maritime contract ambiguous in terms, is not bound within the narrow limits of a court of law. Evidence ordinarily inadmissible in a case at law might be admitted upon equitable principles in a court of admiralty to explain an ambiguity in a maritime contract. To this effect libelant aptly cites a decision by the late Circuit Judge Pardee (Downs v. Wall [C. C. A.] 176 F. 657), and Justice Gray in Watts v. Camors, 115 U. S. 353, 6 S. Ct. 91, 29 L. Ed. 406.

From the face of the contract, and the allegations of the libel, the contract is not dependent on mere expectation, nor is it in the category of unilateral contracts, nor does it depend upon a potestative condition, nor is it bad for want of mutuality. The contract is one that anticipates a requirement.

The supplemental libel shows that the libelant has been, since 1916, conducting an oil refinery at Destrehan, maintaining an established business with a consistent volume of selling, and shipping its asphalt product to Hamburg, where it has a special agency for handling it; that, knowing libelant's shipping requirements, the respondent solicited all of its shipping or business or bookings of such asphalt to Hamburg; that, to relieve itself of the obligation of performance assumed by it, libelant would be compelled to go out of the business of producing and shipping to that point, just as the respondent would be compelled on its part to show a cessation of its sailings to Hamburg, at least from the

port of New Orleans, within which the Destrehan landing is located, to avoid liability for a failure of performance on its part.

Libelant cites 1 Williston on Contracts, par. 104, p. 216, together with numerous citations of cases, to the effect that the contract alleged to be invalid for want of mutuality must be read and considered in the light of the previous business relations of the parties, and, where one should give and the other receive all of the commodity or service contemplated, each promising to meet all of the requirements of the other, the mutual obligation of the parties to perform the contract constituted a consideration for the promise of each, both being engaged in established business.

To this effect also is the opinion of the Circuit Court of Appeals in Texas Co. v. Pensacola Maritime Corp., 279 F. 19, 24 A. L. R. 1336, reaffirmed in 292 F. 61. In that case the contract was an undertaking on the purchaser's part to buy exclusively all of its requirements at Pensacola from the defendant. The defendant agreed to sell to plaintiff all such requirements up to certain fixed quantities. The court said that here was the consideration of a promise both to do and to refrain from doing a certain thing as a consideration for the promise to sell certain goods at fixed prices. It was not a mere undertaking to buy what plaintiff might desire, but an undertaking to take all of its needs from defendant alone, within the quantities stated. In the case at bar, the cargo space, up to the shipper's requirement, was the subject of the undertaking, and this the respondent was bound to furnish within the prescribed limits.

Manhattan Oil Co. v. Richardson Lubricating Co., 113 F. 923, is to the same effect. There the Circuit Court of Appeals (Second) held that it was quite immaterial that the quantity of oil to be sold and bought was not definitely determined at the date of the contract, but was to be ascertained by extrinsic evidence. To the same effect is Jenkins Co. v. Ansheim Sugar Co. (D. C.) 237 F. 278, where the distinction was drawn sharply between a mere option to buy and an agreement to buy all required during the period contemplated. Also Lime Locomotive & Machine Co. v. National Steel Castings Co. (C. C. A.)

155 F. 77, 11 L. R. A. (N. S.) 713; Robertson v. Miller (C. C. A. 2d) 286 F. 508, citing Marx v. American Malting Co. (C. C. A.) 169 F. 582, to the effect that, where the certainty can be ascertained from the means to be supplied by the future exercise of the business in good faith, and in the normal manner of such business, such a commercial transaction does not lack mutuality. This principle has been applied to contracts that provide for the purchase and sale of the total amounts of given articles needed or required in an established enterprise over a definite period. Texas Co. v. Pensacola Maritime Corp., cited supra, and Pittsburgh Plate Glass Co. v. Neuer Glass Co. (C. C. A.) 253 F. 161, 165.

It follows that, since the libel alleges that the two parties to this contract were each engaged in an established business, known to the other, with respect to which the contract was made, there was no lack of mutuality. The contract was enforceable on both sides. The contract did not leave the parties with a mere hope or expectation of future business, such as was presented in Dennis v. Slyfield (C. C. A.) 117 F. 479; nor did it leave one party free to refuse to accept the rejection of the other and thereby escape his obligation, as in Hind, Rolph & Co. v. Bertaut & Co. (D. C.) 9 F.(2d) 191; nor did it place the performance of the essence of the contract at the steamship company's will, entirely subject to its option, as in Tweedie Trading Co. v. Parlin & Orendorff, 204 F. 50, 122 C. C. A. 364.

If the business of libelant was not established and the character and volume of its possible requirements known and contemplated by the contract, there might be reason to consider that, by using the word "available," the libelant had reserved to itself the right to ship or not to ship at its option. However, from the libel and the contract, the contrary appears. No less does it appear that the word "agrees" was used in the present, and not the future, tense, and that the respondent was firmly obligated to load or cause to be loaded the ships operated and controlled by it upon the notice prescribed by the terms of the contract.

Accordingly, the exceptions will be overruled.